UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ) <br> CHRISTOPHER CRENNEN, ) <br> ) <br> Plaintiff-Relator, ) <br> ) <br> v. ) <br> ) <br> DELL MARKETING, L.P., et al., ) <br> ) <br> Defendants. ) <br> _____) | Case No. 06-10546-PBS |

### RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANTS GTSI, UNISTAR-SPARCO, AND EMTEC'S MOTIONS TO DISMISS

Plaintiff-Relator Christopher Crennen ("Relator") hereby submits this response in opposition to the motions to dismiss filed by Defendants GTSI Corp. ("GTSI") (Doc. 98), Unistar-Sparco Computers, Inc. ("Unistar") (Doc. 101), and Emtec Federal Inc. ("Emtec") (Doc. 104).[1]  For reasons discussed below, the motions should be denied.

I.   Procedural background.

Relator filed this action under seal on March 28, 2006, alleging that GTSI, Unistar, Emtec and others were liable under the False Claims Act for misrepresenting the country of origin of computer products offered for sale to government agencies through the government's GSA Advantage! website.  On July 22, 2009, after this Court ordered the case unsealed, the United States notified the Court that, because it had not completed its investigation, it was not intervening at that time.  As the government stated in its notice:

---

[1] GTSI, Unistar, and Emtec are represented by the same counsel, and their briefs are essentially identical.

> The Government's investigation has not been completed and, as such, the United States is not able to decide whether to proceed with the action. Accordingly, the United States hereby notifies the Court that it is not intervening at this time. However, the Government's investigation will continue.

Notice of United States Regarding Intervention, Doc. 22, p. 1.

On September 18, 2009, Relator filed his First Amended Complaint ("FAC"), Doc. 29. The FAC did not substantively amend the allegations of the original complaint, but significantly reduced the number of named defendants, in an effort to heed this Court's prior admonition to that effect.

II.     <u>Motion to dismiss standards</u>.

As the Supreme Court has noted, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), *quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957). "[F]or the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*, 550 U.S.] at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Iqbal*, 129 S.Ct. at 1949. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

2

unlikely." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted); *see also id*. at 570 (noting that plaintiffs must "nudge[] their claims across the line from conceivable to plausible").

III.     The First Amended Complaint states a claim under the False Claims Act.

In his previously-filed response to Hewlett-Packard's motion to dismiss, Relator showed how the First Amended Complaint stated a claim under sections § 3729(a)(2) and (a)(1) of the False Claims Act. *See* Relator's Response to Hewlett-Packard's Motion to Dismiss, Doc. 80, p. 3-9.[2] Relator also notes that the United States has filed a statement of interest agreeing that Relator has stated a claim under the False Claims Act based on violations of the Trade Agreements Act (TAA). *See* United States' Statement of Interest, Doc. 88, p. 1-2 ("assuming the Relator has pled fraud with sufficient particularity to satisfy Fed. R. Civ. P. 9(b), then the Relator's complaint states a claim under the FCA"). Rather than repeating those arguments herein, Relator incorporates these briefs by reference. Relator also notes that GTSI, Unistar, and Emtec do not actually argue that the FAC fails to state a claim based on violations of the TAA, but simply argue that the FAC fails to comply with Rule 9(b).

In their motions, defendants hypothesize various scenarios under which it might be permissible to sell items originating from a non-designated country. However, defendants appear to concede that, if their respective GSA contracts exceed the $194,000 threshold, then they are subject to the country of origin requirements of the TAA. *See*, *e.g*., GTSI Brief, Doc. 99, p. 10 ("the TAA and associated TAA certification clauses … are incorporated into contracts

---

[2] As stated in Relator's prior brief, "[u]pon further consideration, Relator has decided not to pursue an allegation of conspiracy under 31 U.S.C. § 3729(a)(3). Accordingly, the Court may consider subparagraph (3) of paragraph 49 of the FAC as withdrawn." Relator's Response to Hewlett-Packard's Motion to Dismiss, Doc. 80, p. 9 fn. 5. Relator also limits his arguments in this brief to the application of the TAA, rather than the BAA. As discussed herein, defendants' violations of the TAA are sufficient to state a claim under the False Claims Act, irrespective of whether the products at issue meet an exception under the BAA.

3

only where the minimum value of the contract exceeds $194,000"); Unistar Brief, Doc. 102, p. 10; Emtec Brief, Doc. 105, p. 10.  As the government noted in its statement of interest, the value of the acquisition is determined by the anticipated total value of the contract.  *See* United States' Statement of Interest, Doc. 85, p. 2-3 and fn. 11.

Significantly, none of the defendants asserts, as a factual matter, that its GSA contract actually falls below the $194,000 threshold, and for purposes of a motion to dismiss, the FAC's allegations that defendants are subject to the TAA's country of origin requirements clearly cannot be said to be facially implausible.  Indeed, copies of the contracts for two of the defendants at issue in this motion – Emtec and Unistar – may be found on the GSA Advantage! website itself.[3]  The Unistar contract is identified as Contract No. GS-35F-0218M, and covers the period January 22, 2002 through January 21, 2012.  *See* Exhibit A attached hereto.[4]  The Emtec contract is identified as Contract No. GS-35F-4564G, and covers the period April 1, 1997 through April 30, 2009.[5]  *See* Exhibit B attached hereto.  Significantly, each of these contracts contains an express provision stating that:

> All items are U.S. made end products, designated country end products, Caribbean Basin country end products, Canadian end products, or Mexican end products as defined in the Trade Agreements Act of 1979, as amended.

---

[3] The GSA website contains an alphabetical list of contractors, and clicking on the contractor's name takes you to a page with information regarding the contractor's GSA contracts. (http://www.gsaelibrary.gsa.gov/ElibMain/contractorList.do?contractorListFor=A).  In some but not all cases, this page contains a link to the actual contract.

[4] https://www.gsaadvantage.gov/ref_text/GS35F0218M/0EV5D1.1QOJ4G_GS-35F-0218M_GS35F0218MTAC07.PDF (last visited December 11, 2009).

[5] https://www.gsaadvantage.gov/ref_text/GS35F4564G/0G1KL9.1UCD3O_GS35F4564G_TANDCS.PDF (last visited December 11, 2009).

Exhibit A, p. 4, ¶ 8; Exhibit B, p. 6, ¶ 8. The fact that this express certification was included in the contracts is a clear indication that the anticipated value of these multi-year contracts was in excess of the applicable threshold.

Although a copy of GTSI's contract does not appear to be available on the GSA Advantage! website, there is no reason it is implausible to believe that its contract also exceeds the TAA threshold. It should be noted that the GSA Advantage! website identifies items offered for sale by a company under a particular contract number. Attached hereto as Exhibit C are printouts from the GSA website relating to each of these defendants' contracts: GTSI (Contract No. GS-35F-4120D); Unistar (Contract No. GS-35F-0218M); and Emtec (Contract No. GS-35F-4564G). These printouts indicate that there are more than <u>10,000 items</u> offered for sale under each of the four contracts. Clearly, Relator has a plausible basis for asserting that the defendants' multi-year contracts for the sale of more than 10,000 different items are subject to the TAA's country of origin requirements – indeed, it would appear to be implausible to assert that the contracts fall below the TAA threshold.[6]

IV.   <u>The First Amended Complaint satisfies Rule 9(b).</u>

    A.   <u>The claims under subsection (a)(2) satisfy Rule 9(b).</u>

As to Relator's claims under subsection (a)(2) of 31 U.S.C. § 3729, defendants appear to concede that Rule 9(b) does not require Relator to identify specific false claims for payment submitted to the government. Indeed, such a contention was expressly rejected by the First

---

[6] Defendants ask the Court to take notice of the alleged fact that "it is industry practice for manufacturers to produce the same product in more than one country so that they can sell trade compliant products in the United States." *See*, *e.g.*, GTSI Brief, p. 11. Defendants provide no support for this factual assertion, and do not contend that it applies to the particular products identified by Relator. Accordingly, this assertion provides no basis for granting defendants' motions to dismiss.

5

Circuit in *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40 (1st Cir. 2009), which held that:

> The Supreme Court held that claims under subsections (a)(2) and (a)(3) need not show that a false claim has actually been presented to the government….
>
> *Allison Engine* thus forecloses, in subsection (a)(2) and (a)(3) cases, a broad reading of portions of our *Karvelas* and *Rost* holdings. For example, in *Karvelas*, which involved a subsection (a)(1) claim, we said that "the defendant's presentation of false or fraudulent claims to the government is a central element of *every* [FCA] case," *Karvelas*, 360 F.3d at 232 (emphasis added), and that a complaint must "provide details that identify particular false claims for payment that were submitted to the government," *id.*, *repeated in Rost*, 507 F.3d at 731. <u>That is true only of cases under subsection (a)(1)</u>, which expressly includes a presentment requirement. As to subsection (a)(2) or (a)(3) claims, the relator must still connect the allegedly fraudulent statement to a <u>planned</u> claim on the government fisc, must show that the defendant <u>intended</u> the statement would have a material effect on the government's decision to pay a claim, and must plead the facts of the fraud with sufficient particularity to satisfy Rule 9(b).

*Gagne*, 565 F.3d at 46 and fn. 7 (underlining added).

Contrary to defendants' assertions, Relator has clearly identified false statements made to the government, and has connected those statements to planned claims on the government fisc. With respect to identifying the false statements, Relator has alleged that defendants misrepresented the country of origin of specific items offered for sale on the GSA Advantage! website, and has provided a list of such items, including the manufacturer's identification number, the misrepresented country of origin, and the actual country of origin. *See* FAC, ¶ 35-36 and Exhibit A.[7]  Moreover, Relator has clearly demonstrated how the allegedly fraudulent statements are connected to a "planned" claim on the government fisc – indeed, the entire

---

[7] Attached hereto as Exhibit D are illustrative copies of printouts from the GSA Advantage! website made by Relator during his investigation of this case.  These printouts relate to products identified in Exhibit A of the complaint, and show the country of origin represented by defendants for the products at issue.  Relator provides these copies to support the factual basis of his allegations regarding defendants' false statements, and to indicate the type of evidence Relator could include in an amended pleading, if necessary.

6

purpose for falsely representing the country of origin is to effect a sale to government agencies through the GSA Advantage! website – quite clearly a "planned claim on the government fisc." Accordingly, Relator has provided the details necessary to satisfy Rule 9(b) with respect to his claims under subsection (a)(2).

      B.    <u>The claims under subsection (a)(1) satisfy Rule 9(b)</u>.

With respect to Relator's claims under subsection (a)(1), defendants assert that the FAC fails to satisfy Rule 9(b) because it does not identify specific claims for payment submitted to the government – i.e., specific instances in which the items misrepresented on the GSA Advantage! website were actually purchased by government agencies. Although some First Circuit cases, in particular *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004), can be read to require identification of specific claims for payment, it is clear that this is not an inflexible rule applicable to all situations. Indeed, in *Karvelas* itself, after describing certain "types of information that may help a relator to state his or her claims with particularity," the Court stated that:

> These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However, like the Eleventh Circuit, we believe that "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)."

*Karvelas*, *supra* at 233, *quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1312 fn. 21 (11th Cir. 2002).

Subsequently, in *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732 (1st Cir. 2007), the First Circuit noted the "flexibility" of the *Karvelas* test, holding that "Rule 9(b) may be satisfied where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA." In that case, the relator alleged that the defendant's actions caused third parties to submit false claims to the government. Although the

7

Court held that the complaint in that case did not satisfy Rule 9(b), it indicated that Rule 9(b) could be satisfied in such circumstances if the relator "pled a connecting causal link, which strengthens the <u>inference</u> that false claims were submitted." *Id*. at 733 fn. 9 (emphasis added).

Recently, in *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009), the First Circuit once again noted the flexibility of Rule 9(b), rejecting the idea that such rule always requires the identification of particular claims for payment:

> In applying Rule 9(b), the district court held that the rule "requires relators to 'provide details that *identify particular false claims* for payment that were submitted to the government.'" *Duxbury*, 551 F. Supp. 2d at 114 (*quoting Rost*, 507 F.3d at 731) (emphasis added). This was error. In *Rost*, we noted a distinction between a qui tam action alleging that the defendant made false claims to the government, and a qui tam action in which the defendant induced third parties to file false claims with the government. 507 F.3d at 732 (noting that latter action is "in a different category" than former). In the latter context, we held that a relator could satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility" without necessarily providing details as to each false claim. *Rost*, 507 F.3d at 733; *see also United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (holding that FCA claims under Rule 9(b) "may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").

The Court indicated that compliance with Rule 9(b) is to be considered on a case-by-case basis, stating that "we decline to draft a litigation manual full of scenarios of what allegations would be sufficient for purposes of Rule 9(b)." *Id.* at 32 (brackets and quotation marks omitted).[8]

In recognizing this flexibility, the First Circuit has joined a growing number of circuits rejecting the idea that the identification of particular claims for payment is a *sine qua non* for complying with Rule 9(b). Indeed, the Eleventh Circuit, whose *Clausen* decision was relied on

---

[8] *See also United States ex rel. Poteet v. Lenke*, 604 F. Supp. 2d 313, 324 fn. 22 (D. Mass. 2009) ("Defendants also move to dismiss the Amended Complaint for failure to identify individual false claims for payment that were submitted to the government. When an FCA complaint alleges that a defendant caused false claims to be presented by a third party (i.e., through an alleged kickback or off-label marketing scheme), it must include facts that are sufficient to support an inference that false claims for payment were likely submitted to the government.").

heavily by *Karvelas*, has subsequently upheld complaints against Rule 9(b) challenges even without the identification of specific claims, where there were other indicia of reliability supporting an inference that such claims were submitted. *See U.S. ex rel. Walker v. R & F Props. of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (noting that "[t]hese allegations are sufficient to explain why Walker believed LFM submitted false or fraudulent claims "); *U.S. ex rel. Hill v. Morehouse Medical Associates, Inc*., 2003 WL 22019936 (11th Cir. Aug. 15, 2003).

> Similarly, the Fifth Circuit recently noted that:
>
> Rule 9(b)'s ultimate meaning is context-specific, and thus there is no single construction of Rule 9(b) that applies in all contexts. Depending on the claim, a plaintiff may sufficiently "state with particularity the circumstances constituting fraud or mistake" without including all the details of any single court-articulated standard--it depends on the elements of the claim at hand.

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009) (quotation marks omitted). The Court rejected the idea that the identification of specific claims submitted for payment is always necessary to satisfy Rule 9(b), when the relator has otherwise sufficiently alleged a fraudulent scheme:

> Stating "with particularity the circumstances constituting fraud" does not necessarily and always mean stating the contents of a bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme…. <u>It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills</u>.
>
> In sum, the "time, place, contents, and identity" standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act. We reach for a workable construction of Rule 9(b) with complaints under the False Claims Act; that is, one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud. We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

9

*Id*. at 190 (emphasis added). As discussed above, *Grubbs* was favorably cited by the First Circuit in its recent decision in *Duxbury*, 579 F.3d at 29.

Relator submits that, with respect to the requirement of identifying particular claims for payment, the facts of the present case more easily lend themselves to the flexible standard articulated in *Duxbury* and *Grubbs*. As discussed above, the entire purpose for listing an item for sale on the GSA Advantage! website is to effect a sale of that item to a government agency.[9] By listing the item for sale on the website, and misrepresenting the country of origin to do so, defendants have already made a false record or statement for the purpose of getting a planned claim paid or approved, thus subjecting themselves to liability under subsection (a)(2). A requirement that, to satisfy Rule 9(b) with respect to a claim under subsection (a)(1), the complaint must identify a specific instance where a government agency actually consummated a purchase of that item would thus do nothing to further Rule 9(b)'s purpose of protecting defendants from spurious accusations of wrongdoing. *See Rost*, 507 F.3d at 733. Although it is theoretically possible, if extremely unlikely, that no federal agency ever actually ordered a single one of the misdesignated products offered by defendants on the GSA Advantage! website, that would not lessen defendants' intent. Accordingly, the purposes of Rule 9(b) would not be served by requiring the identification of specific consummated sales at the pleading stage.

---

[9] The situation is thus different from that presented in *Rost*, where the defendant's actions involved marketing drugs to physicians for off-label purposes. In that case, the fulfillment of the scheme would not necessarily lead to claims on the government, since physicians might only prescribe drugs for off-label purposes to patients who were not federally insured. *See Rost*, *supra* at 732 (noting that criminal information indicated that "'[i]n most, if not all, instances, patients taking Genotropin [for off-label uses] paid ... out-of-pocket without reimbursement from any public or private third-party payors.' This tends to undercut the strength of the inference that fraud on the government in fact occurred."). In the present case, by contrast, the fulfillment of the scheme would necessarily result in a claim being paid by the federal government.

V.   This action is not barred by the public disclosure doctrine.

In its motion to dismiss, Defendant Dell Marketing L.P. ("Dell") argued that Relator's claim should be barred by the "public disclosure" doctrine of 31 U.S.C. § 3730(e)(4)(A). According to Dell, Relator's claim is based upon a public disclosure because Relator gained certain information by examining the country of origin labels on certain products located in government buildings.  Dell Brief, Doc. 96, p. 3-5.  Although GTSI, Unistar, and Emtec do not make a separate public disclosure argument, they purport to adopt any arguments asserted by any other defendant.  Accordingly, Relator responds to the public disclosure argument here.[10]

As an initial matter, the public disclosure doctrine does not bar lawsuits simply because some factual information connected to the lawsuit is available in public venues to those who know what to look for.  To the contrary, the doctrine applies only if the action is based upon allegations or transactions that have been publicly disclosed in certain specific forums identified in the statute.  The statute states that:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a <u>criminal, civil, or administrative hearing</u>, in a <u>congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation</u>, or from the <u>news media</u>, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added).  Thus, in order for the public disclosure bar to apply, the information must have been publicly disclosed in (i) a criminal, civil, or administrative hearing, (ii) a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or (iii) the news media.  It seems obvious that a country of origin label affixed to the back of a computer that happens to be located in a government facility is none of these things.

---

[10] For separate reasons, Relator has decided to dismiss his claims against Dell.

Dell notes in its brief that, when the government produces documents in response to a Freedom of Information Act (FOIA) request, some courts have found that such production constitutes a public disclosure. In fact, there is a split of authority on this issue. *Compare United States ex rel. Mistick v. Hous. Auth. of the City of Pittsburgh*, 186 F.3d 376 (3rd Cir. 1999) (holding that FOIA response constitutes public disclosure) *with United States v. Catholic Healthcare W.*, 445 F.3d 1147, 1153 (9th Cir. 2006) (response to FOIA request does not necessarily constitute public disclosure).

However, those cases which hold that a FOIA response does constitute a public disclosure do so under the theory that, by the very act of assembling documents in response to the request, the government is creating an "administrative report," which is one of the formats enumerated in the statute. *See*, *e.g.*, *Mistick*, *supra* at 383-384 (holding that FOIA response is an administrative report because it "provides information and notification regarding the results of the agency's search for the requested documents and constitutes an official and formal statement concerning those results"); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 176 (5th Cir. 2004) (FOIA response is an administrative report "because the response (1) 'constituted official government action' -- i.e. it is administrative -- and (2) 'provides information and notification regarding the results of the agency's search for the requested documents'"). Thus, it is the affirmative act of the government in assembling and producing the documents in response to a FOIA request that creates an "administrative report" subject to the public disclosure rule.

Unlike a FOIA response, a manufacturer's label stating "Made in China," affixed to a computer in a government facility, does not constitute an "administrative report." Indeed, Dell admits this in its brief. Dell Brief, Doc. 96, p. 4 ("government library access is not an

12

administrative report in the literal sense"). The label does not constitute the result of an agency's search for requested documents, nor does it constitute an official and formal statement concerning those results. Indeed, the label is not the result of any government action at all, but is something placed on the equipment by the manufacturer prior to the sale to the government. Thus, there is simply no way that the labels reviewed by Relator can be considered "administrative reports."

Not only is a country of origin label on a piece of equipment not an "administrative report," but there has also been no "public disclosure" of such information. As the First Circuit and other courts have recognized, the public disclosure rule is not implicated simply because a document is <u>potentially</u> subject to a FOIA request, and there is no public disclosure until the document has actually been requested and produced. *See U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007) ("The mere fact that the disclosures are contained in government files someplace … does not itself constitute public disclosure"); *U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1520 (9th Cir. 1995) ("In the FOIA context, information cannot be deemed disclosed until a member of the public requests the information and receives it from the government"); *U.S. ex rel. Stinson etc. v. Prudential Ins. Co.*, 944 F.2d 1149, 1161 (3d Cir. 1991) (information "hidden in files" is not publicly disclosed); *Mistick*, *supra* at 383 ("information may be easily accessible to the public -- it may be available under FOIA to anyone who simply files a request -- but unless there is a request and the information is actually produced, it is not publicly disclosed"). Accordingly, there is simply no basis for holding that Relator's inspection of labels on computers in government facilities implicates the public disclosure rule.

VI.   <u>Relator should be allowed to amend his complaint to correct any deficiencies found by the Court.</u>

As discussed above, Relator believes the FAC states a claim under the False Claims Act. In the event the Court concludes otherwise, Relator requests the opportunity to amend the complaint to cure any deficiencies found by the Court. As the First Circuit has noted:

> Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires," and reflects a liberal amendment policy…. Grounds for denial generally involve undue delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment.

*Rost*, *supra* at 733-734 (indicating that a request for leave to amend made in opposition to motion to dismiss should be treated as motion to amend).

Relator notes that, after the withdrawal of Relator's prior counsel, new counsel did not enter an appearance until September 17, 2009. The Court denied counsel's request for an extension of time beyond September 30, 2009 to serve the complaint. Given the time constraints, the First Amended Complaint did not substantively change the allegations of the original complaint, but simply reduced the number of defendants in an attempt to address this Court's expressed concern on that topic. At the time Relator filed the FAC, no party had raised any arguments that the complaint did not satisfy Rule 9(b). Accordingly, Relator believes that he should be allowed at least one chance to substantively amend the complaint, if necessary, to address any deficiencies actually raised by defendants and found by the Court. *See*, *e.g.*, *United States ex rel. Bledsoe v. Cmty. Health Sy*s., 342 F.3d 634, 645 (6th Cir. 2003) (holding that relator should have been allowed to amend complaint, where "his first notice that the complaint was deficient came from the district court's September 18, 2001 opinion, which then proceeded to dismiss his case with prejudice").

**CONCLUSION**

For the reasons discussed above, defendants' motions to dismiss should be denied. In the event the Court finds that the FAC is deficient in any respect, however, Relator respectfully requests the opportunity to amend the complaint to correct any such deficiencies.

This 11th day of December, 2009.

        Respectfully submitted,

        /s/ G. Mark Simpson
        G. Mark Simpson
        GA647725
        Simpson Law Firm, LLC
        165 North Main Street
        Jonesboro, Georgia 30236
        (678) 610-1994
        (678) 302-8721 (fax)
        mark@marksimpsonlaw.com

        Hillary Schwab, BBO #666029
        Lichten & Liss-Riordan, P.C.
        100 Cambridge Street, 20th Floor
        Boston, MA 02114
        (617) 994-5800

Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

This 11th day of December, 2009.

/s/ G. Mark Simpson
G. Mark Simpson
GA647725
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, Georgia 30236
(678) 610-1994
(678) 302-8721 (fax)
mark@marksimpsonlaw.com